# In the United States Court of Federal Claims

No. 21-2346C
22-5C
Filed: March 11, 2022<sup>*</sup>

---

**CERES ENVIRONMENTAL SERVICES, INC.,**

        *Plaintiff,*

**and**

**D&J ENTERPRISES, INC.,**

        *Consolidated Plaintiff,*

**v.**

**UNITED STATES,**

        *Defendant,*

**and**

**DRC EMERGENCY SERVICES LLC,**

        *Defendant–Intervenor.*

---

*Lochlin B. Samples*, Smith Currie & Hancock, LLP, Atlanta, GA, for the plaintiff, with *Parker A. Lewton*, of counsel.

*Carl A. Gebo*, Gebo Law LLC, Atlanta, GA, for the consolidated plaintiff.

---

<sup>*</sup> Pursuant to the protective order in this case, the Court initially filed this opinion under seal on February 18, 2022 and directed the parties to propose redactions of confidential or proprietary information by March 4, 2022.  (ECF 49.)  The parties disputed which information to redact. (ECF 60, 61.)  The defendant proposed very limited redactions.  The defendant–intervenor, with the support of the plaintiff, proposed more extensive redactions.  The Court circulated a version of the opinion redacting some, but not all, of the defendant–intervenor and plaintiff's proposed redactions and invited the parties to provide comments.  The defendant accepted the Court's redactions, and no other party commented on or objected to them.  Accordingly, the Court releases publicly that version of the redacted opinion.  Redactions are denoted with three asterisks in square brackets, [* * *].

*Borislav Kushnir*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant, with *Tarrah M. Beavin*, U.S. Army Corps of Engineers, of counsel.

*Kyle R. Jefcoat*, Latham & Watkins LLP, Washington, DC, for the defendant–intervenor, with *David R. Hazelton*, *Julia A.C. Lippman*, and *Joshua J. Craddock*, of counsel.

## MEMORANDUM OPINION

*HERTLING*, Judge

In this post-award bid protest, the plaintiffs, Ceres Environmental Services, Inc. ("Ceres") and D&J Enterprises, Inc. ("D&J"), challenge the award by the United States Army Corps of Engineers ("Corps") of a sole-source contract issued without competitive bidding to DRC Emergency Services, LLC ("DRC") for debris removal in Graves County, Kentucky, following a tornado that struck on December 10, 2021.

The plaintiffs move for judgment on the administrative record and request injunctive relief on the grounds that the award was arbitrary and capricious and violated federal law and procurement regulations. The plaintiffs focus their argument particularly on an alleged violation by the Corps of Federal Acquisition Regulation ("FAR") 6.302-2, which authorizes the award of emergency contracts without full and open competition when an agency's need for the service acquired is "of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals . . . ."

The Court finds that the Corps has complied with FAR 6.302-2 and other federal laws, and that the award of the contract to DRC was not arbitrary and capricious. Because the plaintiffs' claims fail on the merits, injunctive relief is inappropriate. Accordingly, the Court denies the plaintiffs' motions for judgment on the administrative record and grants the defendant and defendant–intervenor's motions for judgment on the administrative record.

## I.    BACKGROUND

### A.    The Advanced Contract Initiative

In May 2019, the Corps issued Solicitation No. W912EK-18-R-022 as part of its Advanced Contract Initiative ("ACI"). (AR 1.[1]) The solicitation divided the United States and its territories into 20 regions and solicited proposals for a separate firm-fixed-price single award task-order contract for debris-removal services for each of those regions. The 20 awardees would "provide all labor, transportation, equipment, materials, supervision, and required internal

---

[1] Citations to the administrative record (ECF 29-1, *supplemented by* ECF 37-1) are cited as "AR" with the pagination reflected in that record as filed with the court.

logistics support to remove debris in response to natural or man-made disasters and emergencies" in the United States and its territories. (*Id.*) Kentucky is encompassed in the regional division called the Great Lakes and Ohio River Division ("LRD"). (AR 2.)

Five offerors, including Ceres, D&J, and DRC, submitted proposals for the ACI contract for the LRD in January 2021. (AR 4.) The Source Selection Authority ("SSA") evaluated the proposals based on four factors: management/technical approach, past performance, small business participation plan, and price. (*Id.*) Price was the most important factor, management/technical approach and past performance ranked equally as the next most important factors, and small business participation plan was the least important factor. (*Id.*) Price was equal in importance to the other three factors combined. (*Id.*)

The SSA ultimately selected DRC's proposal because it was determined to provide "the best overall value to the Government." (AR 28.) DRC's management/technical approach was rated as outstanding because its "approach [* * *]." (AR 20.) DRC had a satisfactory rating for its past performance, based on its experiences with [* * *]. (*Id.*) DRC's small-business participation was rated as outstanding. (AR 21.) DRC's proposed price was [* * *] than D&J's proposed price [* * *] than Ceres's proposed price. (AR 19.) Although the SSA acknowledged that D&J and Ceres had relevant experience with [* * *], the SSA did not note that DRC had similar experience with [* * *]. (AR 21, 23, 24.)

The SSA determined that Ceres's management/technical approach was good, its past performance was substantial, and its small-business participation was outstanding. (AR 21.) The SSA praised [* * *]. (*Id.*) Although Ceres and DRC "were considered equally rated in the non-price factors," Ceres's proposed [* * *] was [* * *] than DRC's proposed [* * *]. (AR 26.) The SSA analyzed and compared in detail the underlying merits of both proposals and ultimately found that [* * *] was not justified. (AR 27-28.) The SSA found that DRC's proposal presented a better value to the government. (AR 28.)

The SSA found D&J's management/technical approach acceptable, its past performance satisfactory, and its small-business participation outstanding. (AR 23.) Comparatively, DRC's proposal received higher ratings [* * *] priced [* * *] than D&J's proposed price. (AR 24.) In its analysis of the proposal tradeoffs, the SSA determined that DRC's proposal was superior and that [* * *] was justified.[2] (AR 25-26.)

The Corps awarded the contract for debris-removal services for the LRD region ("LRD contract" or "ACI contract") to DRC on November 9, 2021. (AR 34.) D&J filed a protest of the LRD contract at the Government Accountability Office ("GAO") on December 17, 2021. (AR

---

[2] D&J argues that the SSA determined that DRC's experience was more valuable primarily because of its experience with [* * *]. (ECF 34-1 at 6.) Although the SSA analyzed the offerors' experience with [* * *], the SSA also found DRC's proposal superior to D&J's proposal for several reasons, including [* * *]. (AR 23-26.)

229.)  The protest triggered an automatic stay of performance under the Competition in Contracting Act ("CICA").  *See* 31 U.S.C. § 3553(d)(3).

### B.  The Tornado

On December 10, 2021, an EF-4 level tornado struck Graves County, Kentucky, in the western part of the State.  (AR 179.)  This natural disaster resulted in dozens of deaths and significant damage to communities in Graves County and across Kentucky.  The Corps estimated that the natural disaster scattered more than 1.5 million cubic yards of debris, including "vegetative debris (trees, limbs, shrubs, tree root balls), municipal solid waste (common household garbage, personal belongings), construction and demolition debris including entire residential and commercial structures and their contents, vehicles, food waste, 'white goods' (refrigerators, freezers, air conditioners) and household hazardous waste (cleaning agents, pesticides, pool chemicals)."  (AR 178.)

As of December 28, more than 700 residents of Graves County remained without power, in part because the debris inhibited the local electric utility's ability to restore power.  (AR 183.)  The tornado also adversely affected the water supply by destroying a 500,000-gallon water storage tank.  (*Id.*)  The debris hindered the ability of emergency responders, including fire fighters and medical services, to respond quickly to emergency calls.  (*Id.*)  The debris placed residents at risk of exposure to asbestos, mold, mildew, and insect and rodent infestations.  (*Id.*)  The potential for severe winter weather also further exacerbated the hazards posed by the debris.  (*Id.*)

The day after the tornado, Kentucky Governor Andy Beshear requested that President Biden issue an emergency declaration and federal assistance.  (AR 109-10.)  President Biden declared an emergency later that day and authorized the Federal Emergency Management Agency ("FEMA") to render assistance to Kentucky.  (AR 111.)  On December 12, 2021, President Biden increased the federal funding available for disaster relief in Kentucky.  (AR 114.)

### C.  Award of the Emergency Contract

On December 16, the Deputy Contracting Chief for the Corps' Louisville District called a representative of DRC to ask about DRC's availability to provide debris-removal services under the ACI contract if FEMA were to assign debris-removal responsibilities to the Corps.  (AR 229.)  DRC responded that it had personnel in the area assessing the disaster and could mobilize to provide relief immediately.  (*Id.*)

The next day, December 17, however, D&J filed its protest of the LRD ACI contract award to DRC with the GAO, triggering the CICA stay of the award.

On December 18, the Louisville District's Deputy Contracting Chief confirmed that DRC could mobilize to the area under a separate sole-source contract and honor its pricing under its ACI proposal.  (AR 229.)

On December 20, FEMA tasked the Corps with debris removal and disposal in Kentucky. (AR 115-16.)  Later that same day, the Corps awarded a sole-source, undefinitized contract action ("UCA") and letter contract to DRC for debris removal ("emergency contract").[3]  (AR 117-23.)  FEMA issued the formal mission assignment to the Corps on December 21.  (AR 163-65.)

The Corps noted that "[u]tilizing a UCA allow[ed] the Louisville District to immediately authorize contractor performance for the urgently required debris removal services."  (AR 117.[4])  The Corps invoked FAR 6.302-2 in determining that the need for debris-removal work was of "unusual and compelling urgency" warranting the procurement of services without full and open competition.  (Id.)  The Corps explained its reasoning:

> The Government's best interests demand immediate action by a contractor, and as such, pursuing competition or negotiation at this time is not in the government's best interests.  Without issuing a letter contract, the Government would be unable to undertake emergency debris removal services quickly enough to meet the immediate need to lessen or eliminate current threats to public health and safety, and to restore access to critical access routes, roads, bridges, waterways, and rights-of-way for emergency vehicles and public access.

> For the requirement covered by this UCA, DRC Emergency Services was the selected contractor to perform the project based on the fact that the Government has already conducted an assessment of the firm's capabilities and tentative pricing as part of a separate acquisition for a larger Indefinite Delivery Indefinite Quantity contract for debris removal services that is currently under protest before the [GAO], and that the contractor has already mobilized to the area and is ready to immediately begin work upon issuance of a contract.

---

[3] An "undefinitized contract action means any contract action for which the contract terms, specifications, or price are not agreed upon before performance is begun under the action."  FAR 217.7401.  One example of an undefinitized contract action is a letter contract, which is defined as "a written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services."  FAR 16.603-1.

[4] This page of the administrative record contains what appears to be a typo.  The Corps estimated that "200 million cubic yards of debris" would need to be removed.  The actual number was closer to 1.5-2 million cubic yards of debris.  (See AR 178.)

(AR 118.)  DRC commenced debris removal on December 23, 2021.[5]  (AR 167.)

On January 6, 2022, The Corps issued an after-the-fact justification and approval ("J&A") for its use of procedures other than full and open competition.[6]  (AR 178-87.)  The J&A was written after the award because the Corps had determined that providing it in advance would have unreasonably delayed the acquisition under FAR 6.302-2(c)(1).  (AR 178.)

The Corps explained in the J&A that the "Government's best interests demanded immediate and uninterrupted action by a contractor to address the imminent threats to public health and safety.  For this reason, there was not sufficient time to pursue even a limited competition."  (AR 179.)  The Corps had "examined several alternatives" and "determined that it was not possible to procure any portion of debris removal services using an acquisition strategy that allowed for a competitive selection."  (AR 180.)  Additionally, "[b]ecause the scope of work was not fully defined at the time of award, it was not possible to issue a defined solicitation for competition from multiple contractors."  (*Id.*)  The Corps selected DRC for award "to ensure the selection of a highly qualified and technically capable contractor who could commence performance immediately upon receipt of the mission assignment . . . ."  (*Id.*)

The Corps considered several alternatives, including conducting a full and open competition:

> Negotiations and award of a full and open, best value contract action of this magnitude, without any limitation to competition, could take 6 to 9 months to conduct market research; develop a scope of work; draft and issue a solicitation with a reasonable proposal due date for contractor submissions; review and evaluate past performance, technical and price proposals of all offerors; make a source selection decision; and award a contract.  The duration is based on traditional acquisition requirements that would not be waived . . . .

---

[5] The administrative record contains a discrepancy regarding when DRC mobilized to Graves County.  The J&A notes that DRC "had already begun mobilizing to the area in anticipation of receiving a task order under [the ACI contract]."  (AR 184.)  Elsewhere in the administrative record, the Deputy Chief of the Corps Contracting Office noted that DRC would "mobilize with receipt of the task order . . . ."  (AR 229.)  The exact date on which DRC mobilized is not as relevant as the date on which DRC began removing debris.

[6] Multiple members of the Corps prepared and certified the J&A.  The J&A was reviewed and signed by the Resident Engineer, the Deputy Chief of Planning Programs and Project Management, the Contracting Officer, the Senior District Council, and the Senior Procurement Counsel of the HQ Office of Counsel.  (AR 186-87.)  The Head of Contracting Activity approved the J&A.  (AR 187.)

(AR 180.)  The Corps concluded that "this duration would clearly not allow for immediate commencement of debris removal activities, nor completion of the project within the required timeframe."  (*Id.*)

The Corps also considered the potential approach of pursuing a streamlined acquisition process with limited competition:

> Even under a streamlined approach, employing limited competition among offerors that participated in the [ACI] competition or otherwise expressed interest in the project would take no less than 30 days and would take between an estimated 30-45 days, for adequate solicitation and proposal preparation, evaluation of proposals, and contract award.  The solicitation preparation process would require a definitized scope of work to be developed in order to allow a fair competition among multiple offerors.  Evaluation of proposals would necessarily require evaluation of past performance and technical capabilities of all offerors, as well as price.  Finally, prior to award, a best-value trade-off decision would need to be made considering the respective advantages provided by each offerors' technical and price proposals.  This timeframe does not account for discussions if necessary.

(AR 181.)  Further, even after award was made, a contractor could require two additional weeks to mobilize and become fully operational.[7]  (*Id.*)  Mobilizing prior to receiving award would present contractors with a high level of risk.  (*Id.*)  The Corps concluded that the streamlined approach would be "challenging and difficult to achieve for both contractors and the Government," and that a 45-day extension was an unnecessary enlargement of time for the people of Graves County to face high public-health and safety risks.

Finally, the Corps considered awarding a short-term sole-source contract to DRC while pursuing a second acquisition:

> This acquisition strategy was also deemed infeasible because there was not sufficient time in this short Mission Assignment to complete a second acquisition, and because transitioning the work from one contractor to another would result in slowed or stopped debris removal work.  A period of time to allow for demobilization of one contractor's resources and staging sites would need to occur prior to

---

[7] Ceres argues that the two-week estimate for mobilization contradicts the contractual requirement that DRC mobilize within 24-96 hours of the task order.  (ECF 42 at 13.)  This argument misstates the provision.  The contract provides that "the contractor must also organize [its] team in the first 24 to 96 hours of the notice to proceed."  (AR 185-86.)  Organization of the team is only one step in the mobilization process.

> mobilization of another contractor to the area. Furthermore, it
> would be challenging to establish a logical stopping point for the
> existing debris removal contract, and a logical starting point for a
> new contractor.

(*Id.*) This approach also presented many of the same drawbacks as the streamlined-acquisition approach: 30-45 days to carry out the procurement process, additional necessary mobilization time, and a high risk to contractors mobilizing ahead of time. (AR 182.) "This strategy would also involve substantial duplication of costs as a second contractor would be required to complete mobilization and preparation costs already completed by the existing contractor." (*Id.*) There was also a risk that this strategy would prevent the completion of the work by the deadline FEMA's mission assignment required. (*Id.*) Finally, "the urgent and compelling nature of the works necessitates that the work continue without interruption to ensure the immediate threats to health and safety are addressed without delay." (*Id.*)

The Corps also considered a streamlined acquisition approach with a local area set-aside but deemed that strategy also "not feasible or practicable." (*Id.*)

In reaching its conclusion to make a sole-source award to DRC, the Corps reiterated that there was an "overwhelming volume of debris" within the affected area, and that the debris posed numerous health and safety risks to residents. (AR 183-84.) The Corps asserted that pursuing a sole-source contract was "truly necessary to address the immediate, urgent and compelling requirement in response to the current Major Disaster in Kentucky" and preserved competition "to the greatest extent possible while still providing relief as quickly as possible to the impacted people." (AR 184.)

The J&A noted that the Corps was "mindful" of the requirement of FAR 6.302-2 to "request offers from as many potential sources as practicable under the circumstances," but the Corps determined that "it was not practicable to request an offer from more than one source" and still take immediate action. (AR 185.) "Any delay in immediate action to begin moving debris could have resulted in increased health hazards and loss of life, an unnecessary extension of the period of time in which the people of Graves County experience hazardous conditions, and a delay in restoring power and other critical infrastructure." (*Id.*) The Corps stated that it would continue to seek more permanent contracts under the ACI process. (*Id.*)

On January 6, 2021, in conjunction with the J&A, the Corps definitized its contract with DRC, increasing the price to a total award amount of over $37 million. (AR 189.) The period of performance was also shortened from the initial estimate of April 30, 2022; DRC is to conclude its work under the contract by March 31, 2022. (AR 190.)

On February 7, 2022, the Corps modified the contract to procure the "removal and disposal of all eligible hanging limbs, leaning trees, and stumps located on the right of ways within Graves County, KY resulting from the tornadic event on December 10, 2021." (ECF 47-1 at 1.) The modification decreased the total cost of the contract by $8.91. (*Id.* at 5.) The period of performance was unaltered.

### D.      Procedural History

As noted, D&J protested the ACI contract for the LRD with the GAO on December 17, 2021.  (AR 229.)  D&J also protested this emergency contract at the GAO on December 23, 2021.  That latter protest triggered another CICA stay, this time for this emergency contract.  (AR 166-75.)  The Acting Deputy Assistant Secretary of the Army (Procurement) approved overriding the CICA stay on December 24, 2021.  (AR 176.)

Ceres filed a protest in this court on December 29, 2021.  (ECF 1.[8])  On January 4, 2021, D&J filed a protest in this court to challenge the override of the CICA stay.  (Case No. 22-5, ECF 1.)  This filing caused the GAO to dismiss D&J's protest.  *See* 4 C.F.R. § 21.11(b).  The Court consolidated D&J's and Ceres's protests.  (Case No. 22-5, ECF 13.)  D&J then amended its complaint to protest the award of the emergency contract to DRC.  (ECF 22.)

Ceres filed its motion for a temporary restraining order and permanent injunction on December 30, 2021.  (ECF 6.)  The defendant responded to Ceres's motion on January 3, 2022 (ECF 10); the defendant–intervenor responded on January 4, 2022 (ECF 14).  Ceres filed a reply on January 6.  (ECF 24.)

D&J filed a motion for a temporary restraining order and permanent injunction on January 7, 2022.  (ECF 7.)

The Court held oral argument on both plaintiffs' motions on January 11, 2022.  At the conclusion of oral argument, the Court denied the plaintiffs' motions and later entered an order in accordance with its oral ruling.  (ECF 28.)  The Court also directed the parties to submit a revised schedule for expedited briefing because the definitization of the contract had shortened the period of performance.  (*Id.*)

On January 11, 2022, D&J also filed a bid protest challenging award of the ACI contract for the LRD to DRC with this court.  (*See* Case No. 22-38C.)  That case is currently before Judge Meyers.

The plaintiffs filed motions for judgment on the administrative record on January 24, 2022.  (ECF 34, 36.)  The defendant and defendant–intervenor responded to the plaintiffs' motions and cross-moved for judgment on the administrative record on February 4, 2022.  (ECF 37, 38.)  The plaintiffs filed reply briefs on February 9, 2022 (ECF 41, 42, 43, 44) and the defendant and defendant–intervenor filed their reply briefs on February 14, 2022 (ECF 46, 47).  The Court heard oral argument on February 15, 2022.

Additionally, the government filed a motion to supplement the administrative record (ECF 33), and the Court granted that motion as unopposed.  (ECF 45.)  The plaintiff D&J also

---

[8] Except as otherwise noted, all electronic case filings are docketed in the lead case, Case No. 21-2346C.

9

filed a motion to supplement the administrative record (ECF 35), which the Court denied.
(ECF 48.)

## II.    JURISDICTION AND STANDING

Under this court's bid-protest jurisdiction, the court may hear actions "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

To establish standing under this court's bid-protest jurisdiction, a protestor must be an "interested party."  *Id.*  To be an interested party, a protestor must allege facts, which if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  In a post-award bid protest, the protestor's complaint must "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted)).

The defendant challenges neither the Court's jurisdiction nor the plaintiffs' standing. (*See* ECF 37.)  Jurisdiction over this dispute exists because the plaintiffs allege that the Corps' award of a contract to DRC violated federal law.  The plaintiffs also have standing.  Although they were not actual bidders on the emergency contract, they were prospective bidders because they allege that they would have submitted proposals had the Corps competed the emergency contract.  Both plaintiffs submitted offers for the ACI contract in the LRD region.  They have also demonstrated that they had a "substantial chance" of award had the Corps competed the contract; both plaintiffs were deemed capable of performing debris-removal work in the LRD region during the ACI procurement process.  Accordingly, the plaintiffs have standing to sue.

## III.    STANDARD OF REVIEW

### A.    Motion for Judgment on the Administrative Record

Review of a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims requires the court to make factual findings based on the administrative record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Genuine issues of material fact do not preclude judgment.  *Id.*  Rather, the court holds a trial on

the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record. *Id.* at 1355.

### B. Bid Protests

The Federal Circuit has held that the same standard of review applies to challenges of sole-source awards as to other bid protests. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001).

Bid protests require a two-step analysis. *See Bannum*, 404 F.3d at 1351. First, the court must determine whether the government's conduct is "arbitrary and capricious" or "not in accordance with law" under 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706; *Glenn Def. Marine (Asia) PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *Bannum*, 404 F.3d at 1351. Section 706 directs courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Agency decisions are "'entitled to a presumption of regularity.'" *Palantir USG, Inc. v. United States*, 904 F.3d 980, 995 (Fed. Cir. 2018) (*quoting Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)). "'Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.'" *Id.* (*quoting Domenico Garufi*, 238 F.3d at 1338).

"'[A] bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (*quoting Domenico Garufi*, 238 F.3d at 1332). When a plaintiff alleges that the procurement official's decision lacked a rational basis, "the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'" *Id.* (*quoting Domenico Garufi*, 238 F.3d at 1333). When a plaintiff alleges that the agency violated federal procurement law, the plaintiff must show that the violation was both clear and prejudicial. *Id.* The violation of a regulation is prejudicial when the plaintiff had a "substantial chance" of receiving the contract but for the alleged error. *Id.*

Second, if the government's conduct was "arbitrary and capricious" or "not in accordance with law," the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351.

A court's review of the procurement decision made by the procuring agency in a bid protest is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court "might have reached a different conclusion as to the proper administration and application of the procurement regulations" in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). A court must take care not

to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

## IV.   DISCUSSION

The plaintiffs allege that the award of the emergency contract to DRC violated three procurement regulations (FAR 6.302-2, FAR 12.207, and FAR 1.102(c)), violated 10 U.S.C. § 2304(f)(3), and was arbitrary and capricious.[9]

### A.   FAR 6.302-2

Section 2304(c)(2) of Title 10 permitted the head of an agency to procure services using procedures other than competitive procedures when "the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals."[10]  FAR 6.302-2(a)(2) implements that statutory provision:

> When the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for.

The Court analyzes five issues raised by the parties in its analysis of the Corps' compliance with FAR 6.302-2: (1) whether there was an unusual and compelling urgency for debris-removal services; (2) whether there was a risk that the government would be seriously injured; (3) whether the Corps solicited offers from as many sources as was practicable; (4) whether the period of performance complies with the limitations of FAR 6.302-2; and (5) how this case compares to precedents cited by the parties.

---

[9] The parties also dispute whether the plaintiffs can establish prejudice on the merits. Because the Court holds that the Corps acted rationally and consistently with the law, the Court does not reach the parties' arguments regarding prejudice. *See Bannum*, 404 F.3d at 1351 (describing the issue of whether the bid protestor was prejudiced by agency conduct as a second step in the analysis).

[10] This statutory provision was effective as 10 U.S.C. § 2304(c) at the time that the Corps awarded the contract to DRC on December 20, 2021.  Effective January 1, 2022, the same language has been transferred to 10 U.S.C. § 3204(a).  *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4165 (2021).  The applicable language of the statute has not changed.  The Court refers to the statutory citation as it was when the challenged contract was awarded.

### 1.     Unusual and Compelling Urgency

The plaintiffs argue that the Corps inappropriately invoked FAR 6.302-2 because the work of debris removal and disaster cleanup services is not unusual.

The Court disagrees and finds that the situation in Graves County following the tornado did present the government with an "unusual and compelling urgency" under 10 U.S.C. § 2304(c)(2) and FAR 6.302-2.  Although, as the plaintiffs argue, natural disasters occur regularly, and the Corps can plan for them and the commensurate cleanup of the debris they generate, this disaster was both "unusual" and "compelling."  The plaintiffs misstate the test for FAR 6.302-2 (emphasis added): the question is whether "the agency's *need* for the supplies or services is of such an unusual and compelling urgency," not whether debris removal following a natural disaster is an unusual service.

The tornado was unusual in that it was a level EF-4, the second most severe level of tornado on the Enhanced Fujita scale used to measure the severity of tornadoes.  (*See* AR 229.)  It also struck in December, a time when tornadic activity is rare and when subsequent winter weather poses extraordinary risks to the affected population.  This tornado was also unusual in the breadth of destruction it caused.  The tornado "traversed over 200 miles in Kentucky" and was "recognized by the National Weather Service to be one of the longest in history."  (AR 109.)

Not only was the tornado itself unusually severe, but the emergency conditions it created were themselves "compelling" and required "urgency" in the government's response.  More than 1.5 million cubic yards of debris littered Graves County, impeding travel and access on roads and other rights-of-way.  Many people were "unable to access general roadways to obtain food and supplies."  (AR 183.)  The debris slowed and prevented the transportation of food and necessary supplies to Graves County.  (*Id.*)  In addition, the power was out for hundreds of residents of Graves County, and repair crews were being hindered by the debris.  (*Id.*)  During winter, the absence of heat posed an urgent threat to safety and security.  The tornado also destroyed a 500,000-gallon water storage tank and damaged the local water facilities.  (*Id.*)  Removing the remnants of the destroyed water tank was "critical to enable reconstruction of this essential utility infrastructure."  (*Id.*)  The debris also risked exposing residents to asbestos, mold, mildew, and infestations of insects and rodents.  (AR 184.)

Accordingly, the Corps properly invoked 10 U.S.C. § 2304(c) and FAR 6.302-2 to respond to the emergency.

### 2.     Injury to the Government

Ceres argues that the government "has alleged potential harm to citizens and residents of Kentucky but has not articulated any harm to the government as required to apply the unusual and compelling urgency exception."  (ECF 42 at 16.)

The Court finds that the Corps acted to prevent "serious injury, financial or other, to the Government."  FAR 6.302-2(b)(2).  The court has interpreted this requirement of FAR 6.302-2(b)(2) to encompass situations in which the public at large could be harmed.  In *PMTech, Inc. v.*

*United States*, 95 Fed. Cl. 330, 346 (2010), the court reasoned that "a threat of immediate harm to health, welfare or safety would create a situation where the 'unusual and compelling urgency' of agency needs permits a sole-source procurement." The court found harm to the government when, without a CICA-stay override, there was a risk that radioactive materials would leak and contaminate surrounding buildings and the environment. *Id.* at 349.

The Court agrees with the rationale of *PMTech*. "Serious injury . . . to the [g]overnment" includes serious risk to the health and safety of the public the government serves. Ceres's reading of FAR 6.302-2(b)(2), which limits the use of the provision to instances in which the government itself would be harmed, is too crimped, and the Court rejects it. The provision enables the government to respond with the necessary urgency and flexibility to address the needs of the citizenry and not simply to attend to its own bureaucratic interests.

In addition, the J&A explains why awarding a very short-term contract for immediate debris removal and then a contract for a longer term would harm the government. Because of the potential need for a follow-on contractor to mobilize, the government would have faced "substantial duplication of costs" to respond to the same event. (AR 182.) The strategy would also present "high risk" to the government because the condensed timeframe would allow no room for error and could "prevent the work required by the FEMA mission from being completed by the date the mission assignment expires." (*Id.*) Those prospects satisfy the requirement that the government show serious financial harm.

### 3.    Solicitation from as Many Sources as Practicable

Under FAR 6.302-2(c)(2) (emphasis added), "agencies *shall* request offers from as many potential sources as is practicable under the circumstances."

The plaintiffs argue that the Corps did not solicit proposals from as many sources as "practicable" and violated FAR 6.302-2(c)(2). Ceres points out that the Corps did not contact other potential offerors, like Ceres, despite knowing that multiple contractors had submitted offers for the LRD contract and that employees of Ceres were preparing to make an offer for the emergency contract.[11]  (ECF 36-1 at 11.) D&J also underscores that it was capable of performance of the services the Corps required, and that the LRD contract was under protest and stayed as a result. (ECF 34-1 at 18.)

---

[11] In support of its argument, Ceres has appended several exhibits to its brief that allegedly demonstrate its ability to mobilize quickly and the Corps' knowledge in advance of Ceres's capabilities. Ceres has not moved to supplement the administrative record with these materials. Accordingly, on this motion for judgment on the administrative record, the Court does not consider these documents. *See Axiom*, 564 F.3d at 1379-80 ("'The task of the reviewing court is to apply the appropriate [Administrative Procedure Act] standard of review, 5 U.S.C. § 706, to the agency decision based on *the record the agency presents to the reviewing court*.'" (Emphasis in original) (*quoting Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985))).

The Corps explained in the J&A why the only "practicable" option was to pursue a UCA with DRC:

> The Government's best interests demanded immediate and uninterrupted action by a contractor to address the imminent threats to public health and safety. For this reason, there was not sufficient time to pursue even a limited competition. Additionally, the scope of the effort was not sufficiently defined to request a proposal from one or more contractors. Without issuing a Letter Contract/UCA on a sole-source basis, the Government would be unable to undertake emergency debris removal services quickly enough to meet the immediate need to lessen or eliminate current threats to public health and safety, including allowing for restoration of access to critical access routes, roads, bridges, waterways, and rights-of-way for emergency vehicles and public access.

(AR 179-80.)

D&J argues that none of the proposed alternatives the Corps identified in the J&A included "requesting offers from other vetted providers using the same terms as those given to DRC—unit pricing to remove approximately 1.5 Million to 2.0 Million cubic yards of debris." (ECF 34-1 at 11.) Although the emergency contract was initially undefinitized, D&J highlights that the Corps already knew the geographic scope and approximate volume of debris that needed to be removed at the time that the Corps awarded the emergency contract to DRC. Ceres adds to this argument that contracts for post-disaster debris removal are predicated on unit pricing that would have allowed the Corps to receive and quickly evaluate other offers.

The defendant counters that "requesting proposals from multiple sources would have amounted to a competition, which, by statute, has to include all the essential ingredients of a competitive process: a solicitation with detailed specifications and a defined scope, 10 U.S.C. § 2305(a); a thorough evaluation process, *id.* at § 2305(b)(1); and a formal award decision, *id.* at § 2306(b)(4)." (ECF 47 at 6.)

During oral argument, both plaintiffs disagreed with the defendant's contention that the requirements of 10 U.S.C. § 2305 applied in the context of procurements under the authority of 10 U.S.C. § 2304.

The Court agrees with the plaintiffs that procurements pursued under the authority of 10 U.S.C. § 2304 and FAR 6.302-2 need not use all full and open competitive procedures prescribed by 10 U.S.C. § 2305. FAR 6.302-2(a)(2) itself expressly provides that "full and open competition need not be provided for."

Nonetheless, the plaintiffs propose that the Corps should have engaged in some level of competitive procedure. Even a basic competition like the one proposed by D&J would require the Corps to draft a barebones solicitation against which it could evaluate contractors' proposals. The Corps would then need to give contractors some amount of time to respond. The Corps also

15

would need to engage in a minimal evaluation process.  In short, the Corps would need to engage in a streamlined acquisition process.

As explained in the J&A, the Corps considered engaging in a streamlined acquisition process and found it not practicable:

> Even under a streamlined approach, employing limited competition among offerors that participated in the [ACI] competition or otherwise expressed interest in the project would take no less than 30 days and would take between an estimated 30-45 days, for adequate solicitation and proposal preparation, evaluation of proposals, and contract award.  The solicitation preparation process would require a definitized scope of work to be developed in order to allow a fair competition among multiple offerors.  Evaluation of proposals would necessarily require evaluation of past performance and technical capabilities of all offerors, as well as price.  Finally, prior to award, a best-value trade-off decision would need to be made considering the respective advantages provided by each offerors' technical and price proposals.  This timeframe does not account for discussions if necessary.  In order to pursue this process, approval would be required through a determination and findings for other than full and open competition based on an urgent and compelling justification.  Further, after award, we could anticipate mobilization and preparation efforts to take approximately two additional weeks to be fully operational . . . .   Furthermore, a duration of 45 days to commence work would result in an unnecessary extension of the period of time in which the people of Graves County experience hazardous conditions, and a delay in restoring power and other critical infrastructure.  Therefore, this acquisition strategy was deemed not to satisfy the requirements for immediate mobilization to quickly begin addressing the existing threats to public safety.

(AR 181.)  The Corps' explanation is rational and reasonable.

No other meaningful option was available to the Corps, and the plaintiffs are vague on what else the Corps could have done.  It appears they are proposing that the Corps should have obtained offers from LRD ACI offerors and then not conduct any kind of competition.  There is no support in the law for such a hybrid procurement model.  The Corps had four options: full competition, limited competition, a sole-source award combined with a limited competition, and a sole-source award.  It considered and rejected the first three as too time-consuming and high-risk; it went with the fourth option.  There is no fifth option the Corps could have pursued.

The plaintiffs highlight that under the process that led to the award of the ACI contract for the LRD, the Corps had determined that both Ceres and D&J were able to perform the LRD contract.  The Corps determined that there were [* * *] between the qualitative aspects of

16

Ceres's and DRC's proposals.  (AR 28.)  D&J's proposal was [* * *] than DRC's proposal.  (AR 23.)  The plaintiffs argue that the Corps should have revisited its evaluations under the ACI contract by soliciting offers for the emergency contract from the plaintiffs because the more limited geographic scope of the disaster and concomitant debris removal would have led to different pricing models than what each offered for the ACI competition.

Had the Corps proceeded in the manner the plaintiffs propose, it would necessarily have required some form of competition.  There was not sufficient time to undertake even such a limited competition, or so the Corps found.  And that finding is not, under the circumstances, unreasonable.  The plaintiffs argue that the Corps could have otherwise relied on the ACI offers and requested that those offerors provide new pricing for the more limited emergency contract.  If the Corps had invited offerors for the LRD ACI contract to submit only revised pricing for the emergency contract on an urgent basis, those offerors would almost certainly have had to rely on their proposed pricing for the ACI contract.  It is not realistic to believe the ACI offerors could have presented meaningfully different unit pricing within 24 hours of a request from the Corps for such pricing.  In the end, the Corps would then have had to re-review all aspects of the ACI offers, not simply the new pricing, as the plaintiffs propose.  DRC having been found once to have provided the best value to the government likely would have fared as well again.  And such a review would have taken time, which the Corps did not have.

In sum, the Corps explained and justified its reasons for soliciting an offer only from DRC.  The explanation is coherent and reasonable, and the plaintiffs have not demonstrated that this explanation lacks a rational basis.[12]  *See Banknote*, 365 F.3d at 1351 (placing on the plaintiff the burden of showing that an award decision has no rational basis).  The Court declines to substitute its judgment for that of the agency.  *See Bowman*, 419 U.S. at 285-86.

---

[12] During consideration of the plaintiffs' motions for a temporary restraining order and preliminary injunction, the plaintiffs sought to undercut the defendant's justification by arguing that other counties and municipalities in Kentucky affected by the same line of tornadoes were able to procure their own debris-cleanup services through competitive bidding.  The Court assumes that factual claim to be accurate, but it does not undermine the reasonableness of the decision made by the Corps to proceed as it did.  The plaintiffs make no effort to explain the requirements of competitive bidding for the local governments and how they may differ from the requirements that federal law imposes on the Corps.  The plaintiffs' argument also focuses on the wrong question.  The Court reviews and evaluates the action the Corps took and the process it used, not the process the plaintiffs wish the Corps had employed.  So long as the Corps reasonably explains and supports its decisions, the Court must sustain those decisions.

### 4.      The Period of Performance

The plaintiffs argue that the period of performance of the emergency contract does not comply with the limitations in FAR 6.302-2(d).  (*See* ECF 36-1 at 11; ECF 44 at 8.)

FAR 6.302-2 imposes three limits on the period of performance.  First, the total period of performance of a contract awarded under FAR 6.302-2 cannot exceed the time necessary "[t]o meet the unusual compelling requirements of the work to be performed under the contract." FAR 6.302-2(d)(1)(i)(A).  Second, the period of performance cannot exceed the time necessary "[f]or the agency to enter into another contract for the required goods and services through the use of competitive procedures."  FAR 6.302-2(d)(1)(i)(B).  Third, the period of performance "[m]ay not exceed one year, including all options, unless the head of the agency determines that exceptional circumstances apply."  FAR 6.302-2(d)(1)(ii).

The period of performance meets all three requirements of FAR 6.302-2(d).  First, the period of performance does not exceed the time it will take DRC to remove the debris.  As previously discussed, removal of all the debris is necessary "[t]o meet the unusual compelling requirements of the work to be performed under the contract," as any debris poses health and safety risks to the citizens of Graves County.  FAR 6.302-2(d)(1)(i)(A).  Second, the period of performance does not exceed the time necessary "[f]or the agency to enter into another contract for the required goods and services through the use of competitive procedures."  FAR 6.302-2(d)(1)(i)(B).  The Corps considered alternatively using a bridge contract while undertaking competitive procedures, but it determined that that alternative was "infeasible" because of the time it would take to transition the contract, the lack of a logical transitioning point, duplication of costs, risks to contractors from mobilizing early, and the unnecessary delays that would result. (AR 181.)  Full competitive procedures were estimated to require between six and nine months, which far exceeds the period of performance under the emergency contract.  (AR 180.)  Finally, the period of performance, which is now 100 days, is shorter than one year.  (AR 178.)  The award therefore complies with FAR 6.302-2(d)(ii).

D&J argues that the definitization of the contract to shorten the timeframe for debris removal "indicated that the original time frame in the J&A was unnecessarily long and therefore exceeded the contract duration limits of the statute."  (ECF 44 at 5.)

The plaintiffs rely on *AGMA Security Service, Inc. v. United States*, 152 Fed. Cl. 706 (2021), in support of their argument.  In *AGMA*, Judge Horn found that when an agency shortened a period of performance from 150 days to 60 days, the initial award "exceeded the time necessary 'to meet the unusual and compelling requirements of the work to be performed under the contract.'"  152 Fed. Cl. at 731 (*quoting* 41 U.S.C. § 3304(c)).  The J&A gave "no indication why the period of 150 days was chosen (although the court notes that the maximum period in FAR 3006.302-270, unless the Head of Contracting approved of a longer time than the 150 days) and the government provide[d] no indication as to why the period of performance could be more than cut in half only ten days after the Sole Source Justification & Approval was signed."  *Id.*

This emergency contract differs from the contract at issue in *AGMA*. The emergency contract here was undefinitized at first because the Corps did not know the full scope of the work required. (*See* AR 167 ("[T]he scope of work was not fully defined at the time of award . . . .").) The period of performance was shortened by merely one month. The original period of performance was far less than the year permissible under FAR 6.302-2(d)(ii). The Court finds that by definitizing the contract to shorten the period of performance, the defendant complied with FAR 6.302-2(d).

### 5.    Analogy to Other Cases

The plaintiffs analogize this case to *AGMA*. The defendant instead analogizes this case to *SSI Technology, Inc. v. United States*, 148 Fed. Cl. 147, 161-62 (2020), and the defendant–intervenor analogizes this case to GAO precedent.

This case has some similarities to *SSI Technology*. *See* 148 Fed. Cl. at 161-62. In that case, Judge Holte determined that an agency awarding a sole-source contract had solicited from as many sources as was "practicable" under FAR 6.302-2 when the agency explained in the J&A that it had conducted market research, published a request for information at FedBizOpps.gov, and considered suppliers from whom the agency had procured similar goods in the past. *Id.* Analogously, in this case, the Corps had recently conducted an extensive review of proposals for contractors seeking to provide debris-removal services in the region that included Kentucky. (*See* AR 1-34.) That ACI contract for the LRD region was competed, and the SSA had recently considered and evaluated offerors' detailed proposals, including their technical approaches, their past experiences, and their proposed pricing. As in *SSI Technology*, the government had done its research. Although it is true that the ACI award was stayed due to the GAO protest, that stay does not require the Corps to wipe the slate of knowledge clean and pretend it had not recently evaluated the most likely offerors for this emergency contract.

The plaintiffs attempt to distinguish *SSI Technology*. Ceres points out that the request for information was posted publicly in *SSI Technology*; in this case, in contrast, the government did not issue a request for information for the emergency contract. (ECF 42 at 9.) This argument ignores the fact that the Corps had taken steps under the ACI procurement process to evaluate debris-removal contractors.

D&J argues that the Corps "selectively and prejudicially disregarded the procurement history of the ACI . . . procurement . . . ." (ECF 44 at 6.) This argument is unsupported by the administrative record. The J&A notes that DRC "was the selected contractor to perform the project based on the fact that the Government ha[d] already conducted an assessment of the firm's capabilities and tentative pricing as part of the separate ACI . . . acquisition that is currently under protest before the GAO . . . ." (AR 184.) The record otherwise supports that determination.

The plaintiffs have not demonstrated that *SSI Technology* materially differs from this case, and the rationale of that decision is compelling.

In *Innotion Enterprises, Inc.*, B-419907, 2021 CPD ¶ 315 (Comp. Gen. 2021), the GAO upheld award of a sole-source contract to the incumbent contractor after the solicitation for a new contract was protested and stayed.[13]  The GAO explained that the agency had properly acted quickly to avoid a lapse in service.  In this case, because of the protest of the LRD contract, the Corps could not implement the new ACI contract for Kentucky and, hence, was experiencing a lapse in service at the time it received the tasking from FEMA for debris cleanup.  The Corps thus acted quickly to mitigate the negative consequences of this lapse.  The Court follows the ruling in *Innotion* here and concludes the Corps' effort to address the lapse in service to respond to an urgent and dangerous event was not arbitrary and capricious.

This contract award is also distinct from the award in *AGMA* beyond the distinction addressed above.  In *AGMA*, Judge Horn found that "the Sole Source Justification & Approval was not fully developed and explained . . . ." 152 Fed. Cl. at 729.  The J&A there had focused "on the urgency of a quick award, rather than the merits of why the sole source decision was proper." *Id.*  The defendant conceded during oral argument that the J&A "might be thin." *Id.*  In a section of the J&A where the agency officials were asked to provide additional facts supporting the use of procedures other than full and open competition, the agency had written "NONE." *Id.* at 736.  In contrast, the Corps in this case has elaborated in detail why every alternative was inadequate logistically, financially, and from a health and safety perspective.  (*See* AR 179-86.)  The focus of the J&A in this case avoids the shortcomings identified in *AGMA* that led the court to enjoin that award.

In sum, the Corps properly invoked FAR 6.302-2 and adhered to its requirements.  The plaintiffs have not established a clear violation of FAR 6.302-2.  *See Banknote*, 365 F.3d at 1351.

## B.    FAR 12.207

Ceres argues that the Corps violated FAR Part 12, which governs the procurement of commercial services.  FAR 12.207(a) provides that "agencies shall use firm-fixed-price contracts or fixed-price contracts with economic price adjustment for the acquisition of commercial products or commercial services."  Ceres argues that the Corps' award of the emergency contract to DRC violates this provision because FAR Part 12 governs contracts for debris-removal services, and the emergency contract to DRC was not a firm-fixed-price contract.  (ECF 36-1 at 14.)

The defendant agrees with Ceres that debris-removal services are commercial services subject to FAR Part 12.  (ECF 37 at 21.)  The defendant disputes, however, Ceres's assumption that the emergency contract was not a fixed-price contract.

---

[13] Although the Court is not bound by GAO precedent, the Court may consider it as persuasive authority.  *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009).

In general, "[a] wide selection of contract types is available to the Government and contractors in order to provide flexibility in acquiring the large variety and volume of supplies and services required by agencies." FAR 16.101(a). There are two "broad" categories of types of contracts: fixed-price contracts and cost-reimbursement contracts. FAR 16.101(b). FAR 16.201(a) provides: "Fixed-price contracts provide for a firm price or, in appropriate cases, an adjustable price. Fixed-price contracts providing for an adjustable price may include a ceiling price, a target price (including target cost), or both." Additionally, "[a] fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies," including adjustments based on established prices of specific items, adjustments based on actual costs of labor or material, and adjustments based on cost indexes of labor or material. FAR 16.203-1. Accordingly, the category of fixed-price contracts encompasses a variety of types of contracts, including contracts that have adjustable prices, ceiling prices, or target prices.

An agency may award a letter contract when "the Government's interests demand that the contractor be given a binding commitment so that work can start immediately and . . . negotiating a definitive contract is not possible in sufficient time to meet the requirement." FAR 16.603-2. The FAR contemplates that letter contracts should be definitized "within 180 days after the date of the letter contract or before completion of 40 percent of the work to be performed, whichever occurs first." FAR 16.603-2(c).

The letter contract in this case was a fixed-price contract. The initial award provides: "A firm-fixed-price contract is contemplated." (AR 124.) The award expressly established a ceiling price for initial services and noted that the government "may obligate additional funds to the letter contract upon receipt of a qualifying proposal." (AR 125.) The FAR designates contracts with ceiling prices and contracts permitting economic readjustment as fixed-price contracts. *See* FAR 16.201, FAR 16.203-1. The letter contract therefore qualified as a fixed-price contract and did not violate FAR 12.207(a).

When the contract was definitized, the contract was designated as "FFP" or a "Firm-Fixed Price" contract. (AR 190, 192.) Ceres does not dispute that the definitized contract is a firm-fixed-price contract.

Accepting Ceres's argument in this case could lead to far-reaching and unintended consequences. If Ceres's narrow definition of a fixed-price contract were correct, an agency would never be able to lawfully issue a letter contract for commercial service to respond to a situation involving "unusual and compelling urgency" under FAR 6.302-2. This outcome would render FAR 6.302-2 toothless and handicap agencies' ability to respond to emergencies, and the plaintiffs have not pointed to any indication that Congress intended such a result in enacting 10 U.S.C. § 2304(c).

In sum, the Court finds no violation of FAR Part 12. The letter contract awarded to DRC was a fixed-price contract and complied with FAR 12.207(a).

C.     FAR 1.102-2(c)

D&J argues that the government violated FAR 1.102-2(c), which provides the standard that the government should "[c]onduct business with integrity, fairness, and openness."  D&J points to various parts of the administrative record listing a solicitation number for a solicitation that never existed.[14]  D&J argues that the Corps engaged in "gamesmanship to the point of misrepresentation in its efforts to avoid review." (ECF 34-1 at 21.)

The defendant cites Federal Circuit precedent holding that "cautionary and informative regulations and directives provide only internal governmental direction." *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002).  Such provisions, the Federal Circuit determined, "supply no remedy for private parties in a judicial forum." *Id.*

In line with this reasoning, judges of this court have held that FAR 1.102-2 is not judicially enforceable. *See Harmonia Holdings Grp. v. United States*, 145 Fed. Cl. 84, 91 (2019) ("[I]t is well established that FAR 1.102-2(c) is not a source of any judicially enforceable right"); *Castle-Rose, Inc. v. United* States, 99 Fed. Cl. 517, 532 (2011) (providing that FAR 1.102-2 has "no binding legal force" and is "directory, not mandatory"); *Info. Sciences Corp. v. United States*, 85 Fed. Cl. 195, 202 (2008) (holding that FAR 1.102-2 "imposes no specific substantive obligations on the Government, and therefore is not judicially enforceable").  Other judges of this court have held to the contrary, reviewing agency action for compliance with violations of FAR 1.102-2. *See, e.g., SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 664 (2021).

D&J relies primarily on *California Industrial Facilities Resources, Inc. v. United States*, 100 Fed. Cl. 404 (2011).  (ECF 34-1 at 20-21.)  In that case, evidence in the administrative record supported the plaintiff's argument that the government's contracting officials "intentionally waited until they knew the contract was almost fully performed before posting" the J&A for the sole-source contract.  100 Fed. Cl. at 411.  The court held that "the application of FAR 1.102-2(c) to sustain a bid protest may be debatable." *Id.* at 412.  Nonetheless, the Court held the government's conduct arbitrary and capricious. *Id.*

If FAR 1.102-2(c) is judicially enforceable, the parties dispute which burden of proof applies to a court's evaluation of claims under the provision.  D&J argues that, as the court did in *California Industrial*, a court should review the claim under the arbitrary and capricious standard subject to the usual preponderance of the evidence standard.  The defendant argues that because the claim is effectively a bad-faith claim, as the court found in *BayFirst Solutions, LLC v. United States*, 104 Fed. Cl. 493, 509 (2012), the plaintiff must produce "clear and convincing evidence" that the agency had "specific intent to injure the plaintiff." *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2004).

---

[14] D&J also sought to supplement the record with a press release, affidavit, and announcement on SAM.gov.  (ECF 35.)  The Court denied D&J's motion.  (ECF 48.)

The Court declines to resolve whether FAR 1.102-2(c) is judicially enforceable, because D&J cannot satisfy either standard to prevail even if the provision is subject to judicial enforcement.

Under the defendant's proposed test, D&J presents no evidence in the administrative record suggesting that the Corps had any intent whatsoever to injure D&J specifically.

Even under the standard that D&J proposes, however, it cannot prevail. The Corps included a solicitation number on certain documents related to the award, but it in fact did not solicit offers. D&J has not demonstrated, however, that the Corps' inclusion of the solicitation number is misleading to the level of being arbitrary and capricious. *California Industrial*, the case upon which D&J relies, is distinct. In that case, the administrative record contained an email chain in which one agency official explicitly directed another to "beef up" the J&A to avoid a bid protest. 100 Fed. Cl. at 406. Another email revealed that the agency official had purposefully avoided competitive-procurement procedures because of past experiences with bid protests. *Id.* at 407. A third email showed that one agency official internally rebuked another for publicly announcing the sole-source award prior to the last day possible under federal regulations. *Id.* Furthermore, the agency had waited 26 days between obtaining a quote and ordering the products under the challenged contract. *Id.* at 411. Given these circumstances, Judge Wheeler granted the plaintiff's motion for judgment on the administrative record.

The administrative record here, in contrast, contains no evidence that the government manipulated the procurement process to avoid competition or judicial review. Moreover, the Corps acted virtually without delay. It awarded DRC the sole-source contract on the same day it received the tasking from FEMA. (*See* AR 229.) There is no evidence in the administrative record that the Corps deliberately listed a solicitation number in the contract to confuse or mislead any third parties. Under these facts, *California Industrial* is distinguishable.

On the record before the Court, D&J has not demonstrated that the Corps either acted arbitrarily and capriciously or acted in bad faith. Thus, even if the Court were to conclude that FAR 1.102-2(c) were judicially enforceable, D&J would not prevail on the claim.

### D.    10 U.S.C. § 2304(f)(3)

D&J contends that the government violated 10 U.S.C. § 2304(f)(3)(C). (ECF 34-1 at 22-23.) That provision requires an agency using procedures other than competitive procedures to articulate in the J&A that it has made "a determination that the anticipated cost will be fair and reasonable." D&J argues that the Corps could not have made such a determination because it knew that under their respective ACI proposals, DRC had proposed a [* * *] than D&J.

First, the Court notes that D&J's protest regarding its evaluation under the LRD contract is not at issue in this case and is the subject of a separate protest. Accordingly, the Court does not engage in any review of the Corps' initial determination that DRC's pricing under the LRD contract was fair and reasonable.

Second, the administrative record belies D&J's claim.  In the J&A, the contracting officer "determine[d] that the anticipated cost or price to the Government for this contract action will be fair and reasonable."  (AR 186.)  The Corps negotiated with DRC so that DRC would honor its pricing under the LRD contract (AR 229), which the Corps had already determined to be fair and reasonable.  (AR 28.)

Within the J&A, the Corps' justification regarding the cost is, admittedly, terse.  The government appears to have accidentally retained some boilerplate language instructing contracting officers to "[p]rovide the basis for this determination" and "indicate whether certified cost or pricing data will be required . . . ."  (AR 186.)  Nonetheless, the J&A includes a certification that DRC's price is "fair and reasonable" (*id.*), and the administrative record contains other evidence that the Corps examined whether DRC's price for the emergency contract met the statutory requirement that it be fair and reasonable and found that it was.  (*See* AR 28 (finding DRC's pricing "fair and reasonable" under the LRD contract); AR 229 (confirming that DRC used the same pricing in the LRD contract as it did in the UCA).)

D&J posits that the pricing offered for the ACI contract is not comparable to pricing that offerors could have proposed for a more geographically limited contract for a specific disaster, and that reliance on the pricing proposed for the ACI contract as the basis for determining that DRC's pricing is "fair and reasonable" is arbitrary and capricious.

D&J may well be correct that offerors could have presented different pricing.  The problem with D&J's argument is that the contractors would have needed additional time to propose reliable alternative pricing.  And had the Corps sought other pricing, it would have had to conduct a time-consuming limited competition.  This claim has already effectively been rejected.  In effect, under the time constraint imposed on the Corps by the urgency of the need to respond, the Corps had few meaningful options.  Had the Corps not recently conducted and concluded the evaluation of offers for the ACI contract in the LRD, the terse assertion that DRC's pricing was "fair and reasonable" may not have been sufficient to support the award of a sole-source emergency contract.  In the wake of the recently concluded ACI evaluation by the Corps, however, that assertion is enough, under these circumstances, to support the award.

The Corps therefore did not violate 10 U.S.C. § 2304(f)(3)(C).  It rationally determined that DRC's pricing was fair and reasonable and certified that determination in its J&A for the contract.

### E.      Arbitrary and Capricious Conduct

Ceres argues that the contract award had no rational basis because it was an "end-run around the CICA stay."  (ECF 36-1 at 10-11.)  Ceres analogizes this case to *Innovation Development Enterprises of America, Inc. v. United States*, 108 Fed. Cl. 711 (2013).  D&J argues that the Corps' award of the contract was arbitrary and capricious because it "did not give D&J a chance."  (ECF 34-1 at 26.)

As already discussed, the Corps justified its decision to award a sole-source contract to DRC pursuant to FAR 6.302-2.  The Corps reasoned: "Any delay in immediate action to begin

moving debris could have resulted in increased health hazards and loss of life, an unnecessary extension of the period of time in which the people of Graves County experience hazardous conditions, and a delay in restoring power and other critical infrastructure." (AR 185.)

Of all the alternatives it considered, the Corps determined that none would allow the Corps to avoid delays that would result in unnecessary risks to public health and safety. (AR 180-85.) Full competition would have taken between six and nine months, a period that exceeds the period of performance of DRC's contract. (AR 180.) Even a streamlined acquisition process would, the J&A estimated, have taken at least 30 days, present higher risk to the government and contractors, and unnecessarily delay the cleanup efforts. (AR 181.) Transitioning the contract after a streamlined acquisition would also unnecessarily extend the period of performance, potentially lead to a duplication of costs, and interrupt the work.[15] (AR 182.)

The facts of this case are distinct from those in *Innovation Development Enterprises*. In that case, the court found an agency's award of a contract to be arbitrary and capricious when the "circumstances justifying the award were due to the agency's own lack of advanced planning," and the agency had performed no market research. 108 Fed. Cl. at 727-28. In this case, the Corps did not fail to plan for the occurrence of natural disasters; indeed, the ACI process was intended to have in place the necessary contractor infrastructure around the country to respond to disasters. The contract it had awarded to respond to disasters in Kentucky was the subject of a GAO protest filed just three days before FEMA tasked the Corps with the Graves County cleanup. As previously discussed, the Corps had already conducted extensive evaluations of the offers for the ACI contract in the LRD region. These facts set this case apart from the circumstances that confronted the court in *Innovation Development Enterprises*.

In sum, the rationale for the decision by the Corps to make a sole-source award without competitive bidding to respond to FEMA's request for debris removal in the wake of the tornado in Graves County was well-explained and reasonable. The Court holds that the Corps' award to DRC was not "arbitrary and capricious" under 5 U.S.C. § 706. Because the plaintiffs have not prevailed on the merits, injunctive relief is not appropriate.

---

[15] Ceres argues that the Court should "reject the argument related to duplicated costs as it has no relevance under the exemption allowed for unusual and compelling urgency." (ECF 42 at 13.) The Court disagrees. FAR 6.302-2(b)(7) provides that in its justification for contracting under FAR 6.302-2, an agency should determine that the cost to the government would be "fair and reasonable." The Corps correctly considered the relative costs of alternative procurement strategies in determining which alternatives had a "fair and reasonable" cost and were "practicable." *See* FAR 6.302-2. This point is also relevant to the question of a potential financial injury to the government, another element of the provision. FAR 6.302-2(c)(2).

## V.      CONCLUSION

In its sole-source award of a debris-removal contract to DRC, the Corps did not violate FAR 6.302-2 or any other relevant provision of federal procurement law.  The award of the contract also was not "arbitrary and capricious" under 5 U.S.C. § 706.  The Court denies the plaintiffs' motions for judgment on the administrative record and grants the defendant's and defendant–intervenor's motions for judgment on the administrative record.

The Court will enter an order in accordance with this memorandum opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**